**Dr. Michael GALVIN, Plaintiff,**

v.

**NEW YORK RACING ASSOCIATION, et al., Defendants.**

**No. 98–CV–4087(ARR).**

United States District Court, E.D. New York.

Sept. 28, 1998.

---

Kim P. Bonstrom, Karen A. Murphy, Bonstrom & Murphy, Paul A. Batista, New York City, for Plaintiff.

Jonathan R. Donnellan, Cahill, Gordon & Reindel, New York City, Martin L. Lieberman, John L. Russo, Jamaica, NY, Thomas F. Curnin, Cahill Gordon & Reindel, New York City, Catherine Smith, Ca-

hill Gordon & Reindel, New York City, for Defendants.

### OPINION AND ORDER

ROSS, District Judge.

### BACKGROUND

On March 27, 1998, plaintiff, Dr. Michael Galvin ("Dr.Galvin"), a professional equine veterinarian specializing in thoroughbred racehorses, was present in Barn 38 at the Belmont Park racetrack, treating horses that were under the supervision of trainer Mitch Friedman ("Friedman"). At that time, George Cary, an investigator for the New York State Racing and Wagering Board, reportedly observed Dr. Galvin 'tubing'[1] a horse Cary identified as 'Hip Wolf', presumably for the purpose of improperly administering performance-enhancing drugs. Following an investigation, in April, 1998, the three track officials who supervise Belmont Park, known as the Stewards, suspended Dr. Galvin's license for sixty days, the maximum penalty they could impose. That suspension was stayed, however, pending referral of the matter for review by the Racing and Wagering Board.

Defendant New York Racing Association ("NYRA") is a non-profit body organized for the purpose of supervising the three principal racetracks in the state of New York, Belmont Park, Saratoga Springs, and Aqueduct. By letter dated May 6, 1998, NYRA officials informed Dr. Galvin that the NYRA was instituting its own proceedings against him, concerning not only the incident involving 'Hip Wolf' but also previous acts of alleged misconduct.

After a four day hearing that spanned the period from May 9 to May 19, 1998, the NYRA suspended, until the end of 1998, Dr. Galvin's NYRA "credentials", a determination that had the effect of immediately terminating Dr. Galvin's access to all racetracks controlled by the NYRA. Thereafter, on June 8, 1998, Dr. Galvin commenced this proceeding pursuant to 42 U.S.C § 1983. He alleged, in part, that the NYRA and the individual defendants, all of them NYRA officials, had violated his due process rights in the hearing that resulted in the suspension of his NYRA credentials. Upon filing his complaint, he sought preliminary injunctive relief pending the conclusion of the lawsuit, as well as a temporary restraining order. This court denied the application for a temporary restraint, finding the record as of that time insufficient to demonstrate that Dr. Galvin would be irreparably harmed absent relief pending the determination of his motion for a preliminary injunction. The court then referred the preliminary injunction motion to Magistrate Judge Marilyn Dolan Go to conduct an evidentiary hearing and issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1). After three days of hearings, on August 14, 1998, Judge Go issued her report and recommendation, concluding that the preliminary injunction should issue.

Defendants have submitted extensive objections to virtually all aspects of Judge Go's report. As required by § 636(b)(1), the court now reviews Judge Go's report and recommendation de novo as to all findings of fact and conclusions of law to which timely objection has been made.

### DISCUSSION

■ The legal requirements for the grant of a preliminary injunction are not disputed. A preliminary injunction will issue only upon a demonstration of "irreparable harm, and 'either (1) a likelihood of success on the merits of [the] case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor [of the moving party].'" *Polymer Technology v. Mim-*

---

1. 'Tubing' is the use of a plastic tube inserted through the nostril for the administration of drugs directly into the stomach of a horse.

*ran,* 37 F.3d 74, 77–78 (2d Cir.1994), quoting *Coca–Cola Co. v. Tropicana Prods., Inc.,* 690 F.2d 312, 314–15 (2d Cir.1982). Finding both irreparable harm and a likelihood of success on the merits, Judge Go did not address the alternate prong of the test for preliminary injunctive relief involving a balance of the hardships. The court has conducted a de novo review of the entire record. For the reasons that follow and, except insofar as otherwise indicated, for the reasons persuasively expressed by Judge Go in her well-reasoned and thorough report, the court adopts Judge Go's recommendation and orders the entry of a preliminary injunction.

. I. Irreparable Harm

In concluding that Dr. Galvin would suffer irreparable harm absent preliminary injunctive relief, Judge Go rejected Dr. Galvin's arguments that the denial of constitutional rights *per se* constituted irreparable harm, Report and Recommendation, at 190–91, and found, rather, that the damage that the NYRA suspension would inflict upon Dr. Galvin's veterinary practice sufficed to constitute irreparable harm. In so doing, she declined to impose the stringent standard governing preliminary injunctions in the context of the termination of employment, applying, rather, the standard that the Second Circuit has adopted in cases "where a party is threatened with the loss of a business." *Id.* at 190, quoting *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 37 (2d Cir.1995). Judge Go explained the rationale underlying the distinction between irreparable injury in the context of termination of employment and in the context of the termination of a business principally on the ground that "a plaintiff subject to adverse action in employment ... has the ability to recover lost income and reinstatement should he prevail. In contrast, a monetary award will not necessarily enable Dr. Galvin to regain his clients and reestablish his practice at NYRA tracks, the profession he has been develop-

ing for the past ten years." Report and Recommendation, 191–92.

The NYRA disputes Judge Go's conclusions. It argues that even under the irreparable injury standard applied in the context of the termination of a business, the injury suffered by Dr. Galvin is speculative, and better characterized as lost customers and profits than as the true termination of a business. Defendants' Mem. Of Law, at 14. In any event, the NYRA contends, Dr. Galvin can compensate for any injury from his lost practice on NYRA racetracks by moving his practice to other tracks and servicing horses off-track. *Id.* at 17. The NYRA also seeks to distinguish those authorities defining irreparable injury in the context of loss of a business. It urges that Dr. Galvin's flexibility and mobility make his situation analogous to that of an employee who has been removed from his position, rendering applicable the more stringent irreparable injury standard for granting a preliminary injunction. *Id.* at 18–22. Finally, the NYRA disputes that Dr. Galvin will in fact suffer lasting harm as a result of the seven month NYRA suspension. *Id.* at 22–25.

 The courts of this circuit have generally found that the loss of an individual's opportunity to practice his trade in a particular position, typically, in the employer-employee context, does not present 'irreparable harm', *see, e.g., Shady v. Tyson,* 5 F.Supp.2d 102 (E.D.N.Y.1998), but that the termination of most or all of a business is 'irreparable harm'. *See, e.g., Roso–Lino Beverage Distributors, Inc. v. The Coca–Cola Bottling Company of New York, Inc.,* 749 F.2d 124 (2d Cir.1984). The initial question posed is thus whether the suspension of Dr. Galvin's credentials, and consequently his inability to practice at NYRA-operated tracks, is better characterized as the loss of an employment opportunity, as defendants argue, or as the termination of a business, as Judge Go concluded.

It is undisputed that Dr. Galvin is not an employee of NYRA, nor is the NYRA a

'supplier' of a 'product' to Dr. Galvin. Rather, by giving credentials to Dr. Galvin, the NYRA acts as a regulatory body, providing him with an opportunity to ply his trade. No business relationship as such exists between Dr. Galvin and the NYRA.

As noted, the NYRA contends that Dr. Galvin's practice is not analogous to that of the businesses to which the more lenient standard of irreparable injury has been applied. The NYRA asserts that because Dr. Galvin's operation is not "stationary" but rather operates "from his vehicle", he is "capable of conducting his veterinary practice anywhere." Defendants' Mem. Of Law, at 16–17. The distinction the NYRA would draw is without legal import. The irreparable harm inquiry as applied by this circuit addresses the actual injury to the movant's business—a factor affected minimally, if at all, by the mobility of that business.

■ The NYRA's argument that Dr. Galvin's suspension is more akin to the loss of employment is similarly specious. Defendants' Mem. Of Law, 18. As Judge Go found, Report and Recommendation, 190–91, the key distinction between the termination of an employment relation and the termination of a fundamental business relationship is the effectiveness of a permanent injunction in returning the respective plaintiffs to the *status quo ante*. An unlawfully discharged employee can be reinstated and given money damages to remedy the loss of wages during the period of unemployment. A business that has been disrupted by the illegal termination of a critical contract, however, cannot so easily be returned to its previous status. The great difficulty in calculating exactly what has been lost, in terms of the value of the business as a going concern and the goodwill it has developed, makes equitable relief appropriate.

For this reason, the loss of Dr. Galvin's livelihood is appropriately judged by the business termination standard, and the irreparable harm requirement will be satisfied, if, in fact, his suspension during the pendency of this case will destroy or seriously disrupt his practice as a veterinarian specializing in thoroughbred racehorses.

■ In order to demonstrate irreparable injury under the business termination standard, the lost business relationship must be one that was vital to the continuation of the business. "Where the availability of a product is essential to the life of the business or increases the business of the plaintiff beyond sales of the product— for example, by attracting customers who make purchases of other goods while buying the product in question—the damages caused by loss of the product will be far more difficult to quantify than where sales of one of many products is the sole loss. In such cases, injunctive relief is appropriate." *Tom Doherty Associates, Inc. v. Saban Entertainment,* 60 F.3d 27, 38 (2d Cir.1995).

The total loss of a business clearly constitutes irreparable injury. *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197 (2d Cir.1970) (withdrawal of Ford franchise from company that sold only Ford automobiles); *Roso–Lino Beverage Distributors, Inc. v. Coca–Cola Bottling Co. of New York, Inc.,* 749 F.2d 124 (2d Cir.1984) (withdrawal of Coca–Cola franchise from company that only bottled Coca–Cola products). But the loss of business need not be total, so long as it is so great as to seriously compromise the company's ability to continue in its current form. The risk that a company's customers would turn to competitors who stocked a market-dominating product created the potential for injury which could not be rectified by money damages and thus constituted "irreparable harm". *Jacobson & Company v. Armstrong Cork Co.,* 548 F.2d 438, 444–45 (2d Cir.1977). However, when the product whose distribution is to be terminated represents only a small, and noncritical, fraction of the plaintiff's business, then no "irreparable harm" is threatened, and no injunction will issue. *Jack Kahn*

*Music Co., Inc. v. Baldwin Piano & Organ Co.,* 604 F.2d 755, 763 (2d Cir.1979) (loss of Baldwin piano line not irreparable when it neither constituted bulk of plaintiff's business nor was core attraction to potential customers); *accord P. J. Grady, Inc. v. General Motors Co.,* 472 F.Supp. 35, 37 (E.D.N.Y.1979) (termination of Buick dealership not irreparable harm when plaintiff still operated Chevrolet dealership).

█ The NYRA disputes that the suspension of Dr. Galvin's suspension will cause significant harm to his business. The NYRA argues that "Judge Go's conclusion that Dr. Galvin's veterinary practice has been 'effectively destroyed' by the suspension (Report at 30) is simply not supported by the record[,]" because Dr. Galvin "failed to name a single client who has been, or imminently will be, lost due to his suspension." Defendants' Mem. Of Law, 20–21. These NYRA arguments mischaracterize the record. In fact, the uncontradicted testimony at the hearing before Judge Go demonstrated both the injury that the suspension of Dr. Galvin's NYRA credentials will inflict upon his current practice and the significant difficulty he would confront in rebuilding a similar practice during or after the suspension.

Three veterinarians, including Dr. Galvin, testified before Judge Go concerning the effect that the NYRA suspension would have on Dr. Galvin's practice. Dr. Belden, an experienced equine veterinarian, testified that, in 1982, he had closed his private practice for eight months while serving as the chief veterinarian of the NYRA. Hearing Tr. 59. According to Dr. Belden, during the eight month hiatus from private practice, his clients moved permanently to other veterinarians. Hearing Tr. 60. Turning to Dr. Galvin's suspension, Dr. Belden opined, based on lengthy experience in the field, that Dr. Galvin's clients too would use other veterinarians during his suspension, and that it would be difficult, if not impossible, to recover that lost business following the suspension Hearing Tr. 65. Testifying as

to the stigmatizing effect of the loss of NYRA credentials, Dr. Belden stated that "if you're a racetrack veterinarian, you lose your badge to the racetrack, substantially you're out of business .... in a very, very short period of time his [Dr. Galvin's] practice will be history." Hearing Tr. 64. In short, it was Dr. Belden's opinion that the likely effect of the NYRA suspension would be that Dr. Galvin's practice would be "completely destroyed." Hearing Tr. 76.

Dr. Belden also explained the difficulties confronted in building a practice in a related field:

Q And is it a career change when you have—when you've built up a thoroughbred practice, would it be a career charge to go into the standardbred industry?

A In two respects, yes. Certainly the rules of racing and the conduct of practice are different or very different, and that's not an insurmountable obstacle.

The difficult obstacles are the acquisition really of clients, and that's—any time you come into a new community, particularly a closed community like a racetrack, there are a finite number of—finite number of patients and a finite number of clients, and assuming that the veterinary community is near saturation, it's going to be very, very difficult to carve a substantial practice in a situation like that without having something extraordinary.

Hearing Tr. 91–92.

Dr. Nixon, an equine surgeon at Cornell University, testified that "[h]is [Dr. Galvin's] practice here on these tracks I think will be harmed for a considerable period of time." Hearing Tr. 118–119. As to the stigma associated with a NYRA ban, Dr. Nixon attested that "[i]f there is any evidence at all, even a suspicion, a rumor that someone is not following the rules, people will look elsewhere for their veterinary

help, and there are a lot of veterinarians on these tracks." Hearing Tr. 118.

Dr. Galvin testified that in the week before the suspension went into effect, he treated between three hundred and three hundred and fifty horses. In the week immediately after the suspension, he treated eleven horses. Hearing Tr. 378. Dr. Galvin attested that he worked almost exclusively at NYRA tracks, and that only occasionally would he treat horses off-track. Hearing Tr. 381. He testified that "98 percent" of his veterinary work took place on NYRA-operated tracks. Hearing Tr. 382. As to the effect of the suspension on his practice, he explained, "the veterinary practice and me professionally, I will be ruined in this line of medicine." Hearing Tr. 390.

Defendants' characterization of this evidence as "speculative" and "anecdotal" is groundless. Defendants' Mem. Of Law, 23. Each of the veterinarians who testified before Judge Go had many years of experience practicing as an equine veterinarian in the State of New York. While predictions of future business are by definition opinions, nothing in the record suggests that this uncontradicted testimony was not credible or factually accurate. Because Dr. Galvin has demonstrated that his equine veterinary practice will be substantially damaged, if not destroyed, during the pendency of this lawsuit, he has satisfied the irreparable injury prong of the preliminary injunction standard.

## II. The Existence Of A Property Interest Protected By Due Process

■ Procedural due process generally requires "notice and opportunity to be heard prior to the deprivation of a property interest." *United States v. Monsanto*, 924 F.2d 1186, 1192 (2d Cir.1991). The Fourteenth Amendment, however, does not by itself create a property interest. *Sanitation and Recycling Industry, Inc. v. City of New York*, 928 F.Supp. 407, 419 (S.D.N.Y.1996) (citation omitted). Rather, the property interests protected by the Due Process Clause of the Fourteenth Amendment are defined by "existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The parties do not dispute the legal standards governing the creation of a legally protected property interests, but they do dispute whether Dr. Galvin has a property interest that has been affected in this case.

■ Judge Go found that the suspension of Dr. Galvin's NYRA credentials infringed a property interest protected by New York state law, and that, as a consequence, the NYRA could not suspend those credentials without affording due process. Report and Recommendation, 34. In so holding, Judge Go relied upon the determination of the New York Court of Appeals in *Jacobson v. New York Racing Ass'n, Inc.*, 33 N.Y.2d 144, 149–150, 350 N.Y.S.2d 639, 642, 305 N.E.2d 765 (1973) that: "Given NYRA's 'virtual monopoly power over thoroughbred racing in the State of New York,' its decision to exclude a licensee from its tracks 'is tantamount to barring [the licensees] from the only places in the State where he may ply his trade ...'". Report and Recommendation, 192. As in *Jacobson*, Judge Go found Dr. Galvin's exclusion from all NYRA premises tantamount to a termination of Dr. Galvin's interest in his New York Racing and Wagering Board License, concededly a protected property interest. *Id.*

The NYRA objects to Judge Go's findings on two principal grounds. First, the NYRA argues that Judge Go failed adequately to distinguish between the credentials issued by the NYRA, which it contends are not constitutionally protected property interests, and the licenses issued by the New York State Racing and Wagering Board. Defendants' Mem. Of Law, 27–28. Unlike the licenses issued by the New York State Racing and Wagering Board, defendants argue, "the NYRA's discretionary authority to ban or permit access to its private racetracks is unfet-

tered by rules or regulations." Defendants' Mem. Of Law, 28. Because the NYRA is bound by no rules or regulations, the argument continues, Dr. Galvin has no entitlement to NYRA credentials, and hence, no property interest in them. Defendants' Mem. Of Law, 29.

The NYRA also objects to Judge Go's conclusion by attempting to distinguish the two leading New York Court of Appeals cases addressing NYRA credentials, *Jacobson v. New York Racing, Ass'n, Inc.*, 33 N.Y.2d 144, 350 N.Y.S.2d 639, 305 N.E.2d 765 (1973) and *Saumell v. New York Racing Ass'n, Inc.*, 58 N.Y.2d 231, 460 N.Y.S.2d 763, 447 N.E.2d 706 (1983). According to the NYRA: "In contrast to the plaintiffs in *Jacobson* and *Saumell*, Dr. Galvin and many other individuals licensed by the Board engage in professions that are not specific to thoroughbred racing." Defendants' Mem. Of Law, 32. Because Dr. Galvin, the NYRA argues, unlike a trainer or jockey, can practice in places other than NYRA-operated racetracks, the "restriction can in no way be said to deny plaintiff the ability to 'ply his trade'." Defendants' Mem. Of Law, 33.

The court finds NYRA's objections to Judge Go's conclusion unpersuasive. As to the NYRA's first argument, the courts of New York have consistently found that the suspension of NYRA credentials implicates property interests, specifically the interests of holders of New York State Racing and Wagering Board occupational licenses in continuing to enjoy the use of those licenses. *See* 9 NYRCRR § 4002.1. The state courts have interpreted the Racing, Wagering and Breeding Law to mean that "[a] license, for any aspect of the racing business, including petitioner's ... may only be revoked for cause, and then only after a hearing. (Racing, Pari–Mutuel Wagering and Breeding Law § 213(2), (3) 9 NYCRR §§ 4002.9, 4002.10)[.]" *Murphy v. New York Racing Ass'n, Inc.*, 138 Misc.2d 735, 525 N.Y.S.2d 548, 551 (1988). "Thus 'state law has engendered a clear expectation of continued enjoyment of a license absent proof of culpable conduct,' and has created a property interest in the license." *Id.*, quoting *Barry v. Barchi*, 443 U.S. 55, 64 n. 11, 99 S.Ct. 2642, 2649 n. 11, 61 L.Ed.2d 365 (1979). The property interest in these state-issued licenses cannot be infringed by a state body, including the NYRA, without affording due process of law. *Id.*

As to the NYRA's second objection, the court finds persuasive the reasoning and conclusion of the New York Supreme Court in *Murphy*:

> The fact that petitioner may in theory be able to pursue his trade [as a farrier] without access to respondent's [the NYRA's] property also does not sufficiently distinguish this case from *Saumell* to obviate the need for a hearing. Petitioner claims to have done most, if not all, of his work on-track. Clearly, to bar him from the track effectively denies him access to his customers, and viewed from the standpoint of fact, and not theory, prevents him from working. This aside, *Saumell* itself did not rely on the jockey's need for track access in order to find a property right in his license.... *It is this property interest, which, when coupled with the respondent's 'state action' ... entitles the petitioner to a hearing.*

*Murphy*, 525 N.Y.S.2d at 551 (emphasis added) (holding that farrier's property interest was affected by the suspension of his NYRA credentials). The court agrees with Judge Go, and finds that, by suspending Dr. Galvin's NYRA credentials, defendants have effectively deprived Dr. Galvin of a protected property interest, the use of his New York Racing and Wagering Board occupational license, and that the proceedings resulting in such a deprivation thus should have complied with due process. *Barry v. Barchi*, 443 U.S. 55, 64 n. 11, 99 S.Ct. 2642, 2649 n. 11, 61 L.Ed.2d 365 (1979).

### III. The Constitutional Adequacy Of The Process Afforded Dr. Galvin

▮ The parties do not dispute the fundamental principles of due process.

The essence of due process is that "a deprivation of life, liberty or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Board of Ed. v. Louder-mill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985), quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). This principle requires that there be "some kind of . . . hearing" prior to the termination of a legally cognizable property interest. *Board of Regents v. Roth*, 408 U.S. 564, 569–570, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). But, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). The amount of process that is due is dependent on the relative strengths of the interests involved:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 324, 96 S.Ct. 893, 905, 47 L.Ed.2d 18 (1976).

▪ Judge Go found plaintiff likely to succeed on the merits of his claim that the NYRA failed to comply with the requirements of due process when it suspended his NYRA credentials, in part because the NYRA did not give Dr. Galvin sufficient notice to prepare a defense against its allegations of misconduct. Applying the three *Mathews* factors, Judge Go found that "Dr. Galvin's interests in being able to make a full presentation of his defense clearly outweighed the NYRA's interest in speedy resolution of the matter," Report and Recommendation, 192, and that the three day notice that the NYRA provided to Dr. Galvin to prepare for the suspension hearing was "woefully inadequate[.]" *Id.* at 193. Judge Go also found that this procedural deprivation was exacerbated not only by the NYRA's refusal to permit Dr. Galvin to submit post-hearing submissions, *Id.* at 194, but also by the lack of specificity of the charges in the May 6 notice. *Id.*

The NYRA disputes these findings, arguing that its substantial interest in preserving the integrity of racing justified the short notice given to Dr. Galvin. Defendants' Mem. Of Law, 38. Further, the NYRA argues that even if the three day preparation period provided to Dr. Galvin was itself inadequate, the length of the hearings, comprising twenty five hours of testimony over a ten day period, afforded him ample time to prepare a defense. *Id.* at 195. As to Judge Go's finding concerning the lack of specificity of the notice, the NYRA advances two contentions. First, the NYRA argues that the Stewards' earlier investigation into the March 27, 1998 Hip Wolf incident alerted Dr. Galvin to the misconduct with which he was being charged. *Id.* at 196. Second, the NYRA asserts its May 6, 1998 letter satisfied the notice requirement of due process, because "due process [does not] require a full particularization if all of the charges, . . . [but] need only reasonably convey the information required for a party to make an appearance on his or her behalf." *Id.* at 196.

The notice delivered to Dr. Galvin on May 6, 1998, informed him that the NYRA suspension hearing would be held on May 9, 1998 at 9:00 a.m. NYRA Hrg.Exh. 1. As to the charges that the NYRA was pursuing against him, Dr. Galvin was told:

> The New York Racing Association Inc. ("NYRA") is currently investigating an incident at its Belmont Park Racetrack on March 27, 1998 involving the filly Hip Wolf, which it believes may have a detrimental impact on the integrity of racing.

Further, we have and continue to investigate other of your veterinary activities at NYRA's racetracks.

*Id.* By letter dated the next day, May 7, 1998, Dr. Galvin's counsel, Karen Murphy ("Murphy"), requested an adjournment to allow her time to prepare a defense against what she described as the "as-yet-unspecified charges." Tr.Exh. 3; NYRA Hrg.Exh. A at 1. In the same letter, Murphy requested a particularization of the charges being brought against Dr. Galvin, as well as discovery of materials to assist her in the preparation of a defense. *Id.* at 2. On May 8, 1998, the day before the scheduled hearing, Martin Lieberman, counsel for the NYRA, denied the requested adjournment in a letter that failed to address Murphy's request for specification of the charges. At the outset of the NYRA hearing on May 9, Murphy twice reiterated her request for an adjournment; both requests were denied. NYRA Hrg. 20–21; 129. Most significantly, on numerous occasions during the hearings, Murphy precisely detailed how the lack of advance notice of the specific charges against Dr. Galvin had hampered her ability to prepare a defense. NYRA Hrg. 9–15; 122–133; 140–141; 257–258; 263; 415; 424; 683; 726; 1005.

Judge Go found this notice inadequate because it failed to give Dr. Galvin either adequate time or adequate information to prepare a defense. Report and Recommendation, 193–94. The NYRA objects to these findings. Relying on *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 582–83 (2d Cir.1989), the NYRA argues that the investigation carried out by the Stewards concerning Dr. Galvin's treatment of the horse Hip Wolf on March 27,

1998, and the sixty day suspension imposed on Dr. Galvin by the Stewards on April 29, 1998, was more than sufficient to notify Dr. Galvin of the subject matter of the NYRA's own disciplinary hearing. Defendants' Mem. Of Law, 42–43.

■ The NYRA's reliance on *Plaza Health Laboratories* is misplaced. Insofar as the hearings that commenced on May 9, 1998 addressed the treatment of Hip Wolf on March 27, 1998, the notice in the NYRA's own letter may have been sufficient, under all the circumstances, to give Dr. Galvin adequate notice of the charges against him. However, there was no contemporaneous inquiry into any other past misconduct of Dr. Galvin apart from the investigation being conducted by the NYRA itself. This is particularly significant because there was substantial evidence adduced against Dr. Galvin at the NYRA hearing unrelated to the Hip Wolf incident. This evidence, consisting of numerous investigations and reports of Dr. Galvin's veterinary practice over the past seven years formed, at least in part, the basis of the panel's decision to suspend his credentials.[2] Though Dr. Galvin should have been informed of these charges in advance of the hearing, nothing other than the NYRA's own letter could have provided the essential notice. NYRA's notice, however, advised only that the hearing would concern "other of your veterinary activities at NYRA's racetracks." NYRA Hrg.Exh. 1.

■ The NYRA counters that Dr. Galvin's knowledge of his own past practices sufficed to convey 'notice' of these charges. Defendants' Mem. Of Law, 45. The law,

---

**2.** The NYRA panel's ultimate decision in Dr. Galvin's case was based upon "all of the evidence presented [at the hearing]", Tr.Exh. 6, including the evidence as to Dr. Galvin's misconduct apart from his treatment of Hip Wolf on March 27, 1998. *See also* NYRA Hearing, at 7–9 (opening remarks of NYRA counsel). When asked at the preliminary injunction hearing why the NYRA panel had chosen to suspend Dr. Galvin's credentials,

Terence Meyocks, the president of the NYRA and the chairman of the panel, testified: "He tubed a horse; he injected a horse when he shouldn't have been injected. He tubed previous other horses. He mentioned he tubed, I mean, milkshaked a horse called Head Trip previously. He done a lot of things in there that he shouldn't have been doing." Hearing Tr. 159.

however, is otherwise: "One cannot assume an accused is guilty, with knowledge of his own dereliction. Although the framer of these charges may well have had specific incidents in mind, as written they did not give Gleason the information needed to conduct a meaningful investigation and prepare a defense." *Gleason v. Chain Service Restaurant,* 422 F.2d 342, 343 (2d Cir.1970) (per curiam).[3]

The adequacy of notice in this case thus turns on whether the statement, "Further, we have and continue to investigate [sic] other of your veterinary activities at NYRA's racetracks[,]" made three days before the scheduled hearing, met the requirements of due process, given the particular circumstances of Dr. Galvin's NYRA hearing.

■ "Notice, to comply with due process requirements, must be given sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded and it must 'set forth the alleged misconduct with particularity.'" *In re Gault,* 387 U.S. 1, 33, 87 S.Ct. 1428, 1446, 18 L.Ed.2d 527 (1967). The particularity with which alleged misconduct must be described varies with the facts and circumstances of the individual case. "In most cases, due process notice contemplates accusations of specific acts or patterns of conduct unequivocally identified rather than general charges relating to attitudes and behavior patterns unsupported by specific factual allegations." *Wagner v. Little Rock School Dist.,* 373 F.Supp. 876, 883 (W.D.Ark.1973). The exact evidence to be presented need not be included in the notice, so long as the allegations are sufficient to alert the accused to the misconduct with which he is being charged. *Patterson v. Ramsey,* 413 F.Supp. 523, 536 (D.Md.1976) (citations omitted).

■ The specificity and timing of adequate notice also varies with the importance of the interests at stake. *See, e.g., Goss v. Lopez,* 419 U.S. 565, 582, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975) ('notice' may be contemporaneous with hearing for public school disciplinary infractions); *Wolff v. McDonnell,* 418 U.S. 539, 564, 94 S.Ct. 2963, 2978, 41 L.Ed.2d 935 (1974) (at least twenty four hours notice required for hearing as to prisoner's loss of good-time credit); *In re Gault,* 387 U.S. 1, 31, 87 S.Ct. 1428, 1445, 18 L.Ed.2d 527 (1967) (some notice must given prior to juvenile delinquency proceedings); *Crook v. Baker,* 813 F.2d 88, 97 (6th Cir.1987) (written notice of specific charges three months prior to hearing for withdrawing of academic degree was adequate); *Patterson v. Ramsey,* 413 F.Supp. 523, 537 (D.Md.1976) (specific written notice of charges thirty days before hearing for termination of school superintendent adequate); *Nelson v. Diversified Collection Services, Inc.,* 961 F.Supp. 863, 868 (D.Md.1997) (mailing of notice thirty days before garnishment adequate notice for collection of defaulted student loans).

■ The interest at stake in Dr. Galvin's NYRA hearing has already been identified: if his NYRA credentials are suspended, Dr. Galvin will lose his practice. The interest in the practice of one's chosen profession is "substantial[.]" *Barry v. Barchi,* 443 U.S. 55, 64, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365 (1979). Though the NYRA is correct that it too has a strong interest, that of preserving the integrity of racing, *Lindemann v. American Horse Shows Ass'n,* 164 Misc.2d 937, 955, 624 N.Y.S.2d 723, 734 (1994), an interest that may require swift action, *Gilmour v. New York State Racing and Wagering Board,* 405 F.Supp. 458, 461 (S.D.N.Y.1975) (Weinfeld, J.), the NYRA's contention that the seriousness of Dr. Galvin's alleged misconduct necessitated swift action here is

---

**3.** Defendant's dismissal of *Gleason* as pertaining to the Labor Management Reporting and Disclosure Act of 1959 ignores that, in its opinion, the Second Circuit specifically identifies the interests at stake as "the fundamental notions of due process". *Gleason,* at 343.

not persuasive. Defendants' Mem. Of Law, 40. Indeed, the claim is flatly belied by the six weeks of delay between the event immediately precipitating the NYRA action, the alleged 'milkshaking' of the horse Hip Wolf on March 27, 1998, and the notice of the hearing the NYRA delivered to Dr. Galvin on May 6, 1998.

As noted, the inadequacy of the notice is most blatant with regard to Dr. Galvin's alleged misconduct prior to the March 27, 1998 'milkshaking' incident. John Tierney, the Director of Security for the NYRA, testified that Dr. Galvin had twice been sanctioned by the barn area violations panel, once for an incident that occurred on September 3, 1993, and subsequently, for an incident that occurred in March of 1994. NYRA Hearing, 51–52. Through Tierney, the NYRA offered into evidence NYRA investigative reports prepared prior to Tierney's tenure as a Security Director concerning a September 22, 1994 incident involving a horse named Mr. Baba. NYRA Hearing, 52–65. The report, which was accepted into evidence, contains allegations of nine previous incidents, dating from January, 1991, to March, 1994, involving potential violations of NYRA rules by Dr. Galvin ("Tierney Report").[4] NYRA Hearing, Exh. 3. Additionally, an investigator for the Thoroughbred Racing Protective Bureau, Peter Lang, testified to seven incidents of alleged misconduct involving Dr. Galvin dating from January 7, 1998 to March 6, 1998. NYRA Hrg. 242–256. His report, which was also admitted into evidence, contained additional allegations regarding eight other incidents of alleged misconduct by Dr. Galvin, dating from July, 1992 to June 7, 1995 ("Lang Report"). NYRA Hearing, Exh. 9.[5]

██ Although the NYRA argues that any deficiency in its initial notice was

cured by the lengthy hearings, ("[T]here can be no doubt that NYRA's full evidentiary pre-deprivation hearing, extending 25 hours over four days in a ten day period and including oral and written testimony and cross-examination, provided plaintiff with all the process he was due under any circumstances." Defendants' Mem. Of Law, 40), a thorough examination of the NYRA hearing transcript proves otherwise. The transcript demonstrates the numerous difficulties that the ambiguous and precipitate notice created for Murphy. The Tierney Report was not made available to her until the hearing, on May 9, 1998, giving her at most ten days to prepare a defense to the misconduct described in it before the hearing ended on May 19. The Lang Report similarly was made available to her three days later, on May 12, 1998, leaving her only seven days to prepare a response. The defendants' bald assertion that "[t]he conduct of the NYRA hearing … provided plaintiff with an appropriate and fair opportunity to present his case," Defendants' Mem. Of Law, 46, is unconvincing.

Seven or nine days to prepare a defense against at least twelve separate charges of misconduct occurring over seven years is clearly insufficient. In that time, Murphy could not have performed a background investigation into these allegations of misconduct, much less located and prepared witnesses for the hearing. The difficulty of mounting an adequate defense caused by this short notice was aggravated by the vague descriptions of some of the incidents. For example, one incident report reads in its entirety as follows: "September, 1992—Found inside a stall with a horse that was scheduled to race that day under circumstances which indicated he

---

4. This exhibit is actually an amalgamation of eight NYRA Investigation Reports, one interoffice memorandum and one witness affidavit. Two of the incidents described in these reports, indicated as occurring in September, 1993 and March, 1994, are apparently the

same ones that John Tierney described in his testimony.

5. Some uncertain number of the incidents described in the Tierney Report overlap with those described in the Lang Report.

was about to 'milkshake' the horse." NYRA Hrg.Exh. 3.[6]

These difficulties were further compounded by the absence of opportunity for effective cross-examination as to the incidents described in the Tierney and Lang Reports. Tierney testified that all of the incidents described in the Tierney Report predated his employment at the NYRA, which began in April of 1996. NYRA Hrg. 54. Indeed, NYRA counsel argued that Tierney was competent to submit the report solely as a custodian of the NYRA investigative records. NYRA Hrg. 61–62. The Lang Report presented similar difficulties for Murphy. Investigator Lang admitted that he had no personal knowledge of any of the incidents described in that report that occurred prior to 1998. NYRA Hrg. 568. The NYRA panel, in fact, barred Murphy from cross-examination of Lang as to any of the incidents in the Lang Report which Lang had not personally observed, although it allowed the descriptions of these incidents to be admitted into evidence. In ruling the entire report admissible, Terence Meyocks, chairman of the panel, explained: "Many of these incidents were from the NYRA investigations, so we will accept it for our decision making." NYRA Hrg. 577.

"In almost every setting where important decisions turn on questions of fact, due process requires the opportunity to confront and cross-examine adverse wit-

nesses." *Goldberg v. Kelly,* 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970).[7] The NYRA's failure to present evidence of these prior acts of misconduct through competent witnesses, coupled with the panel's reliance on the Lang Report notwithstanding its infirmities, deprived the defense of effective cross-examination. The combination of the short time Murphy was given to prepare a defense to charges that were wholly unknown to her prior to the hearing, and the lack of effective cross-examination due to the NYRA's failure to present its investigative reports through competent witnesses, made these allegations of wrongdoing essentially irrebuttable.[8] The presentation of evidence in this manner is not consonant with due process.

The short notice also limited Murphy's ability to call witnesses in Dr. Galvin's defense. At least four potentially key witnesses were not available to Murphy. Although Mitch Friedman ("Friedman"), the trainer who secretly tape-recorded Dr. Galvin talking about the March 27, 1998 incident, testified for the NYRA, Murphy's cross-examination of Friedman was limited to exploring the chain of custody of the tape-recording, and Friedman was not made available to her as a defense witness. NYRA Hrg. 358, 413–414. John Joyce, one of the Stewards who had initially suspended Dr. Galvin's license, also refused to appear as a defense witness. NYRA Hrg. 413–414.[9] The failure of these witnesses

**6.** The use of this type of written evidence is itself problematic. "Particularly where credibility and veracity are at issue ... written submissions are a wholly unsatisfactory basis for decision." *Goldberg v. Kelly,* 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970). Many of the incident descriptions in the Tierney Report do not even indicate whether they were the result of personal observation by NYRA investigators or were simply records of racetrack gossip and innuendo.

**7.** Cross-examination is not required in every hearing mandated by due process. *Signet Construction Corp. v. Borg,* 775 F.2d 486, 490 (2d Cir.1985). The court need not address this issue in this case, however, because cross-examination was permitted to NYRA counsel. Under these circumstances, funda-

mental fairness required that effective cross-examination also be available to the defense. For this reason, the NYRA cannot rely upon *Baden v. Koch,* 799 F.2d 825 (2d Cir.1986), as to the appropriateness of decision making based on paper records. Defendants' Mem. Of Law, 47.

**8.** Dr. Galvin did testify in his own defense concerning the incidents described in the Lang Report. NYRA Hrg. 771–809. However such testimony, standing alone, cannot be considered an adequate substitute for the testimony of disinterested witnesses.

**9.** Because it was an informal, administrative hearing, Murphy lacked the power to compel witnesses to attend.

to appear may have been more a result of the individuals' own reluctance to testify than Murphy's limited time to prepare. The NYRA, however, made no effort to ameliorate the situation by using its influence to encourage the attendance of these witnesses. NYRA Hrg. 437–438. Moreover, two other witnesses, Leo O'Brien and Gary Sciacca, would likely have testified for the defense had Murphy been provided with sufficient time to secure their attendance at the hearing. The NYRA panel, however, refused to grant Murphy sufficient time to do so, either before or during the hearing. NYRA Hrg. 723, 848–849.[10]

The NYRA's arguments that any deficiencies in its procedure were counterbalanced by the length of the hearings are completely without merit. That "[p]laintiff called five witnesses, offered eight exhibits, and created a transcript of 1,031 pages," Defendants' Mem. Of Law, 48, does not insure that Dr. Galvin was afforded a meaningful, as opposed to a lengthy, hearing.

The procedural deficiencies caused by the abrupt and vague notice given to Dr. Galvin on May 6, 1998 themselves satisfy the 'likelihood of success' requirement for a preliminary injunction on Dr. Galvin's procedural due process claim. Applying the *Mathews* factors, the court is in full agreement with Judge Go that the process the NYRA afforded Dr. Galvin at the suspension hearing was constitutionally insufficient. At relatively little cost or inconvenience, the NYRA could have provided Murphy with copies of the Lang and Tierney Reports sufficiently in advance of the hearing to allow her to summon witnesses and marshal evidence in defense of Dr. Galvin as to the numerous charges they contained. Given the gravity of the penalty imposed, and the substantial risk that the admission of such irrebuttable allegations could have resulted in the erroneous

deprivation of Dr. Galvin's NYRA credentials, due process required no less.

A. Other Due Process Issues

Because the court finds that the notice of the NYRA hearing given to Dr. Galvin was inconsistent with the requirements of due process, the court declines to address Judge Go's findings regarding the participation of the NYRA president, Terence Meyocks, on the panel, and the inference of bias that Judge Go drew from events occurring after the NYRA hearing.

### ORDER

ORDERED, that plaintiff's motion for a preliminary injunction be, and the same hereby is, GRANTED; and it is further

ORDERED that the New York Racing Association reinstate Dr. Galvin's NYRA credentials pending the conclusion of this case.

SO ORDERED.

### REPORT AND RECOMMENDATION

GO, United States Magistrate Judge.

Plaintiff Michael Galvin ("Dr.Galvin"), an equine veterinarian, commenced this action on June 8, 1998, by order to show to cause to stay the decision of the defendant New York Racing Association ("NYRA") suspending his "credentials" issued by NYRA, an action which effectively prevented Dr. Galvin from practicing veterinary medicine at NYRA racetracks. Asserting claims pursuant to 42 U.S.C. § 1983, Dr. Galvin alleges that NYRA and the individual defendants, who are all officials of NYRA, deprived him of his due process rights and equal protection of the laws. He also claims that defendants tortiously interfered with his prospective contract rights.

District Judge Allyne A. Ross denied plaintiff's application for a temporary re-

---

**10.** The court also adopts Judge Go's conclusion that the NYRA further aggravated the difficulties presented by the May 6 notice by denying Murphy the opportunity to submit papers after the conclusion of the hearings. NYRA Hrg. 263.

straining order at a hearing on June 8, 1998, finding that plaintiff had failed to demonstrate that he would be irreparably harmed pending determination of his application for injunctive relief. She then referred plaintiff's motion for a preliminary injunction to me to conduct a hearing and to report and recommend.

Plaintiff elected to forego expedited discovery in order to have an immediate preliminary injunction hearing. In deference to defendants' request for time to submit opposition papers, the hearing did not begin until June 18, 1998 and continued for two additional days the following week. Near the conclusion of plaintiff's presentation at the hearing, defendants declined to call any witnesses.

For the following reasons, I respectfully recommend that plaintiff's motion for a preliminary injunction be granted.

## FINDINGS OF FACT

Most of the pertinent facts presented at the preliminary injunction hearing[1] are not in dispute although the parties differ considerably in their interpretation of the evidence presented at the NYRA administrative hearing[2] which led to the ban at issue here. Based on testimony at the hearing, the administrative record and other filings in this action,[3] I make the following findings of facts. Since an understanding of plaintiff's claims requires some background on the underlying charges, I have summarized the pertinent evidence presented at the NYRA hearing.

1. References to pages in the transcript of the preliminary injunction hearing are in the form "(Tr. # )" and to exhibits in the form. "(Tr.Exh.# )."

2. Plaintiff filed a copy of the record of the NYRA proceedings with his submissions in support of his application for a temporary restraining order. References to pages in the transcript of NYRA hearing are in the form "(N.Y.RA Hrg. # )" and to exhibits in the form "(N.Y.RA Hrg.Exh. # )."

*Background*

Dr. Galvin is a doctor of veterinary medicine specializing in thoroughbred race horses. Since his graduation from the University of Florida, School of Veterinarian Medicine ten years ago, he has worked almost exclusively at NYRA racetracks treating thoroughbred race horses. Tr. 382.

NYRA is a non-profit racing association organized in 1955 and existing pursuant to Section 202 of the New York Racing, Pari-Mutuel Wagering and Breeding Law (McKinney's 1984 and 1997–98 Supp.) ("Racing Law"). *See* Affidavit dated June 16, 1998 of Martin L. Lieberman ("Lieberman Aff."), General Counsel of NYRA, at 2, ¶ 2. The three racetracks owned by NYRA at Aqueduct, Belmont Park and Saratoga are the major sites for thoroughbred horse racing in the State of New York.[4] Tr. 63, 117. NYRA is authorized to hold horse races and to conduct pari-mutuel betting in conjunction with races at its racetracks. Lieberman Aff. at 2, ¶ 2, citing Racing Law §§ 208 and 224. In the past year, over two and one-half million fans have visited NYRA tracks, generating receipts of approximately $2.7 billion. Tr. 145.

The Wagering Board is charged with the responsibility of maintaining control over races and licensing individuals involved in horse races. Racing Law, § 213.1. All owners, trainers, veterinarians and other persons involved in racing activities must obtain an occupational license from the Board before they may engage in any business, occupation or employment relating to

3. I have not considered an unsworn letter dated July 10, 1998 from a Dr. Albert Saer, which was sent by fax to my chambers. Dr. Saer claims in the letter that he is a veterinarian practicing at NYRA tracks and complains about Dr. Galvin's practices. The letter does not indicate whether a copy has also been sent to counsel in this action nor has the author been subject to cross-examination.

4. Finger Lakes, the only other track in New York, has a limited season. Tr. 62–63.

thoroughbred races. 9 N.Y.C.R.R. § 4002.1(b).

Only licensed persons are able to gain access to certain areas of a track, including the stable area and racing strip. 9 N.Y.C.R.R. § 4002.1(i). In order to enforce this restriction, NYRA requires all persons entering the stable area of the track, including the backstretch and paddock areas, to wear appropriate identifying "credentials." 9 N.Y.C.R.R. §§ 4002.1(i) and 4003.5; Tr. 38–39, 69. NYRA routinely issues "credentials" to applicants, so long as they first obtain a license from the Wagering Board and pass background clearance by the NYRA security office. Tr. 432.

Both the Wagering Board and NYRA police the administration of drugs and other substances to horses. Wagering Board regulations prohibit or substantially restrict the use of many drugs on horses scheduled to race. *See* 9 N.Y.C.R.R. part 4043. These regulations specifically limit the use of lasix, or furosemide,[5] to horses qualified to receive this medication and require that eligible horses must be present on the racing grounds for administration of a lasix injection between 4 to 4 ½ hours before race time. Tr. 487; *see* 9 N.Y.C.R.R. § 4043.2(b)(1), 4043.2(b)(6). Drug tests are routinely administered to the winning horses of every race and randomly to other horses to test for the presence of drugs. 9 N.Y.C.R.R. § 4012.3.

Such testing may reveal a lasix "overage" which may result from the late administration of that drug.[6] Tr. 285–85.

Three stewards, one designated by the Wagering Board, one by NYRA and one by the Jockey Club, are responsible for supervising all races. Racing Law, § 212; Tr. 260, 436–38. They are authorized to regulate the conduct of all individuals licensed by the Wagering Board and have power to suspend or exclude for up to sixty days any licensee violating racing regulations. 9 N.Y.C.R.R. § 4022.12;[7] Tr. 436–38.

In exercising their supervision over licensees, the stewards have initiated proceedings against trainers and veterinarians which have resulted in fines or a suspension of their state occupational licenses. Tr. 483–84. Less serious violations by licensees are typically handled by NYRA Barn Area Violations panel or its security department. Tr. 485–86.

In cases involving violations it considers more serious, NYRA management has jurisdiction to convene its own panel to determine whether NYRA should sanction the credential holder. Tr. 486; 9 N.Y.C.R.R. § 4022.12 (N.Y.RA has power to exclude individuals). However, NYRA has not convened such a panel in the past four years, except in the case of Dr. Galvin. Tr. 485; *see* NYRA Hrg. at 50–51.

---

**5.** Lasix is a drug that became available for use in New York racetracks in September, 1995. Tr. 289. It is a diuretic believed to mask the results of drug tests. NYRA Hrg. at 485. Seventy percent of horses stabled at Belmont are registered for the use of lasix. *Id.* at 512.

**6.** In a memorandum dated May 20, 1998, the Wagering Board advised that it had revised penalties for lasix overages, beginning with a $250 fine for the first occurrence, a $500 fine for the second occurrence within 12 months and a more severe penalty for a third occurrence. Tr.Exh. 14.

**7.** This regulation provides, in pertinent part, that:

> If the steward of the board shall find that any person has violated any of the sections of this Subchapter or has been involved in any action detrimental to the best interests of racing generally, he may exclude such persons from the grounds, or any portion of such grounds, of the association conducting the meeting for a period not exceeding 60 days, or he may suspend the license of such person from participating in racing in this State, for a period not exceeding 60 days, or both such exclusion and suspension; and if he considers necessary further action, he shall promptly refer the matter to the board. The steward, in the exercise of his power under this section, shall consult with the steward of the racing association and the steward of The Jockey Club ...

*1997 Investigation of Dr. Galvin*

In the past two years, defendant Kenneth Noe, Jr., the Chairman of the Board of NYRA, became concerned over rumors regarding Dr. Galvin's improper veterinary practices, including late administration of lasix and "milkshaking"[8] of horses. Tr. 186, 439. These concerns led Chairman Noe to initiate a formal NYRA investigation in 1997. Tr. 186–87, 439, 467. NYRA investigators did not independently uncover any evidence of improper conduct. Tr. 470–71.

In September, 1997, NYRA hired the Thoroughbred Racing Protective Bureau ("TRPB"), the leading security body in the racing industry, to assist in NYRA's investigation of Dr. Galvin. Tr. 439. Peter Lang, a TRPB investigator, began his surveillance of Dr. Galvin on January 7, 1998 and observed plaintiff on approximately 17 different days until March 27, 1998. NYRA Hrg. at 239–40, 278. Lang's observations are set forth in his report dated April 22, 1998 admitted into evidence at both the court hearing and the administrative hearing. *See* TRPB Report by Peter Lang dated April 22, 1998 ("Lang Report"), Tr.Exh. 4; NYRA Hrg.Exh. 9.

On March 27, 1998, George Cary, an investigator employed by the Wagering Board, reported that he had observed Dr. Galvin improperly "tubing"[9] a horse scheduled to race later that day. *See* Cary's handwritten report dated March 27, 1998 admitted as NYRA Hrg.Exh. 6 and as part of NYRA Hrg.Exh. 2 ("Cary Report"); Lang Report at 6; NYRA Hrg. at 146–47. Cary charged that he saw Dr. Galvin administer a substance through a stomach tube inserted in the right nostril of a horse named "Hip Wolf" while the horse was held by a black groom. Cary Report at 3.

In the immediate ensuing investigation, the Stewards, Wagering Board and NYRA investigators interviewed, *inter alia,* Dr. Galvin, Mitchell Friedman (the trainer whose horses were stabled in barn 38) and James Stukes (the groom who worked in the barn and allegedly held "Hip Wolf" during the tubing). Memorandum of Wagering Board investigator Robert Froehlich dated March 28, 1998 ("Froehlich Memorandum"); notes of the Stewards in a "report of events" dated March 27, 1998 ("Steward's March 27, 1998 Report"), memorandum from J. Tierney to T. Meyocks ("Tierney Memorandum"),[10] all admitted as part of NYRA Hrg.Exh. 2. What Dr. Galvin and James Stukes said during the interviews is disputed, as discussed further below. However, the Stewards apparently proceeded to act in the belief that Dr. Galvin admitted to having mistakenly tubed Hip Wolf with Naquasone, an anti-inflammatory drug, which he had intended to administer to "Break Through," a filly kept in the stall next to "Hip Wolf." Tr. 271; Stewards March 27, 1998 Report at 3rd and 4th unnumbered pages.

The Stewards scratched Hip Wolf from the race in which he was scheduled to run later that day. Froehlich Memorandum at 4. After unsuccessfully attempting to take a urine sample, State officials took a blood sample from Hip Wolf for testing, but tested only for the presence of Naquasone. The results were negative for the presence of trichlormethiazide, one of the components of Naquasone. Tr. 271 – 73; NYRA Hrg. at 749; NYRA Hrg.Exh. E.

About a month later in late April, 1998, the Stewards conducted a hearing on the

---

8. "Milkshaking" is the administration of a solution, usually a mixture including sodium bicarbonate and sugar, through a tube into a horse's nostril and is commonly believed to improve a horse's performance. NYRA Hrg. 196, 238–39, 488.

9. NYRA promulgated a rule on May 1, 1994 generally prohibiting the presence of equipment for injections or stomach tubing in the stall of any horse scheduled to run within 24 hours. NYRA Hrg.Exh. 13A.

10. The Tierney Memorandum was also introduced at the preliminary injunction hearing as Tr.Exh. 5.

charges against Dr. Galvin regarding Hip Wolf. After that hearing, the Stewards issued a one-paragraph order on April 29, 1998, suspending Dr. Galvin's license for 60 days for improperly administering drugs or medication to the horse "Hip Wolf" on March 27, 1998. *See* NYRA Hrg.Exh. 10. The Stewards also referred the matter to the Wagering Board for further action, but stayed the suspension pending Dr. Galvin's appeal. *Id.* In a separate proceeding, the stewards suspended the license of Mitchell Friedman for 30 days. NYRA Hrg.Exh. 11.

Following issuance of the Stewards' ruling, Chairman Noe, in consultation with defendant Terrence J. Meyocks, President of NYRA, decided that NYRA should commence its own proceeding against Dr. Galvin. Tr. 142, 156. NYRA counsel, Meyocks and Chairman Noe selected a 3–member panel consisting of Meyocks, Frank Gabriel, NYRA Director of Racing, and Donald Combs, NYRA Assistant Racing Secretary, to hear the matter. Tr. 439–40. Meyocks, as President of NYRA, was familiar with the on-going investigation of Dr. Galvin and had received a copy of the prior TRPB and NYRA investigative reports. Tr. 152–53. Meyocks also had discussed Dr. Galvin and the TRPB report with Chairman Noe. *Id.* at 460. However, according to Meyocks, neither Gabriel nor Combs were aware of the investigation of Dr. Galvin's practices and neither had received any investigative reports. Tr. 141, 143, 151; *see also* Tr. 299 (Gabriel's testimony). Gabriel did not learn that he was appointed to the panel until the afternoon of May 8, 1998 the day before the hearing was scheduled. Tr. 297.

There are no formal NYRA procedures for the conduct of a hearing by such a panel or criteria for making a determination. Tr. at 295–96, 436. Chairman Noe did not advise the panel what criteria to use in making its determination, and left the matter to counsel. *Id.* at 440–41. Similarly, he left procedural questions, such as the notice to be given and designation of the chair, to the discretion of legal counsel. *Id.* at 440–41, 460.

By letter dated May 6, 1998 (the "May 6 letter") drafted by NYRA counsel, Chairman Noe notified Dr. Galvin that NYRA had scheduled a hearing on May 9, 1998 (a Saturday) "to determine whether your continued presence at its racetracks is in the best interests of racing." Tr.Exh. 2; NYRA Hrg.Exh. 1. The letter further advised Dr. Galvin that NYRA was investigating "other of your veterinary activities at NYRA's racetracks." *Id.*

Counsel for plaintiff, Karen Murphy, in her letter dated May 7, 1998 to Chairman Noe, requested an adjournment so that her client could prepare to respond to "NYRA's as-yet-unspecified charges." Tr. Exh. 3; NYRA Hrg.Exh. A at 1. She also requested a particularization of charges, including identification of the "other" activities that were the subject of NYRA investigations. In addition, Ms. Murphy sought disclosure of relevant documents in advance of the hearing, including all investigative reports concerning Dr. Galvin and statements obtained by NYRA. *Id.* at 2.

Chairman Noe referred the request to NYRA's General Counsel, Martin Lieberman. Tr. at 472. Mr. Lieberman sent a one-page reply on May 8, 1998 [11] denying Dr. Galvin's request for an adjournment, proclaiming that "[i]t is in your client's best interest that the NYRA-appointed hearing panel hear testimony, receive other evidence, and render its decision at the earliest date ..." Tr.Exh. 4; NYRA Hrg. Exh. C. Mr. Lieberman did not address Ms. Murphy's request for a specification of the charges. Meyocks and Gabriel testified that they agreed that a specification of

---

**11.** Mr. Lieberman initially replied in a one paragraph letter dated May 7, 1998 advising that all inquiries should have been directed to him, in accordance with the instruction in Chairman Noe's May 6, 1998 letter. NYRA Hrg.Exh. C. Ms. Murphy then re-addressed the same letter to Mr. Lieberman.

charges was not appropriate since "the panel didn't have all the evidence ... and didn't at the time know what was going to be presented." Tr. 151, 185.

*The NYRA Hearing*

The NYRA hearing began on the morning of May 9, 1998, continued on May 12, 1998 and May 14, 1998, and concluded in the evening of May 19, 1998. Mr. Lieberman and John Russo, Deputy General Counsel of NYRA represented NYRA, while Ms. Murphy represented plaintiff. Mr. Lieberman stated in his opening remarks that NYRA sought the hearing because of Dr. Galvin's conduct in administering drugs to Hip Wolf, the "latest in a series of incidents" which NYRA regarded as questionable and as "interfering with the integrity of racing." NYRA Hrg. at 7–8.

From the start of the hearing and throughout the proceedings, Ms. Murphy complained about her inability to prepare for the hearing due to the late notice of the hearing, lack of advance notice of the charges, and lack of opportunity to review pertinent documents. NYRA Hrg. at 9–15. After conferring for approximately five minutes, the hearing panel refused to adjourn the hearing because "[t]his is not a court of law," but promised to give "due process." *Id.* at 20–21. Later in the hearing, the panel denied Ms. Murphy's requests for additional time to review documentary exhibits presented by NYRA counsel, *see, e.g.,* NYRA Hrg. at 140–41, but afforded her the right to recall NYRA witnesses for further cross-examination on a subsequent date. NYRA Hrg. at 144. The hearing panel also denied plaintiff's request to compel the attendance of John Joyce, the State Steward, and Friedman. NYRA Hrg. 430–31.

A. *Evidence concerning Hip Wolf*

George Cary testified that he observed Dr. Galvin enter barn 38 at Belmont Park around 12:30 p.m. on March 27, 1998. NYRA Hrg. at 148. Watching from a cottage across from the barn and through an opening in the sliding door, he observed Dr. Galvin standing in front of a stall and then enter. *Id.* at 148–49. Moving to an open exterior barn window and standing on his toes, Cary observed the right side of the horse inside a stall. *Id.;* Cary Report at 2–3. Dr. Galvin was standing on one side of the horse while a black groom (later identified as James Stukes) was holding a bay horse. *Id.;* NYRA Hrg. at 179. Cary saw a tube hanging from the horse's right nostril and extending into a pail held by Dr. Galvin. NYRA Hrg. at 149–50. After Dr. Galvin left the Friedman barn, Cary entered and found out that the horse in the second stall from the end was named "Hip Wolf" and was scheduled to run later in the day. *Id.* at 152–53; *see also* Cary Report at 3.

Plaintiff's counsel attempted to challenge the accuracy of the observations made by Cary and his qualifications as an investigator. However, the hearing panel limited the attempt by plaintiff's counsel to cross-examine Cary about an earlier, allegedly botched investigation. NYRA Hrg. at 188–92.

Plaintiff also argued that Cary could not have clearly seen the horse and Dr. Galvin when he was across from the barn and when he stood outside the bar window which is seven feet off the ground. NYRA Hrg. at 172–73; 643–46; 763–64. Judy Curbello, a stable worker who watched Cary on his tiptoes trying to look in, testified that Cary was not tall enough to peek through the open lower window. NYRA Hrg. at 446–47, 472. Prior to the start of testimony on the May 19, 1998, the hearing panel convened outside the Friedman barn to view the physical configuration of the barn, window and stalls. NYRA Hrg. at 642–44.[12]

12. Plaintiff offered pictures of the exterior barn windows at the hearing, but did not provide a frame of reference to determine the height of the windows or position of the stalls in question.

In addition, plaintiff's counsel challenged whether Cary had correctly identified the horse that had been tubed. Plaintiff claimed he had administered naquasone through a tube to Break Through, a horse in the stall next to Hip Wolf, who needed treatment for an ankle condition. Tr. 276; NYRA Hrg. at 752, 756. Both Break Through and Hip Wolf are bay fillies. NYRA Hrg. at 181, 756; NYRA Hrg.Exhs. 14 and 15. Break Through has numerous patches of white hair on its neck and front chest and white hairs on its face, while Hip Wolf has a small star on its face. NYRA Hrg. at 496–97; 842. Cary did not pay attention to any other horse when he went inside the barn and the only distinguishing feature he observed were some white hairs on the forehead of the horse he identified as Hip Wolf. *Id.* at 86.

At the hearing, Joseph Spadaro, Deputy Executive Director of the Thoroughbred and Breeding Development Fund, testified that it is not possible to make a reliable identification of a horse in a stall from outside the barn ten feet away. Tr. at 248. He also stated that, absent distinguishing marks, a positive identification cannot be made from a visual observation standing in the shed row five or six feet away. *Id.* at 249.

Dr. Galvin maintained at the NYRA hearing that he had medicated Break Through and injected Hip Wolf and another horse with lasix. NYRA Hrg. at 751–53, 768. He disputed that he told investigators that he had mistakenly tubed Hip Wolf, but, rather, agreed only to saying that mistakes are possible. *Id.* at 899–900. Nonetheless, Steward John Joyce felt that Dr. Galvin admitted having mistakenly administered Naquasone to Hip Wolf. Tr. at 261; *see also* Stewards notes at 3rd and 4th unnumbered pages attached as part of NYRA Hrg.Exh. 2. On the other hand, the memorandum of Wagering Board investigator Robert Froehlich reported that Dr. Galvin claimed he had administered lasix to four horses, including Hip Wolf, and then administered an analgesic and Na-

quasone to Break Through, a filly in the stall next to Hip Wolf, through a tube. *Id.* at 2.

Plaintiff also challenged the accuracy of statements that investigators claimed were made by James Stukes. The summary of these interviews are included as part of NYRA Hrg.Exh. 2, including the Froehlich Memorandum; the Cary Report; and a one page report entitled "Interview of James Stukes—Assistant Trainer" concerning an interview on March 27, 1998. These documents indicate that Stukes said he had held Hip Wolf while Dr. Galvin administered a lasix injection and some time later that day, had held Hip Wolf again while Dr. Galvin put a liquid through a tube into Hip Wolf's right nostril. *Id.; see also* NYRA Hrg. at 34, 54. The investigators also reported that Stukes stated that tubing was a common procedure utilized by Friedman and was used to administer a solution to Hip Wolf, who was a "bleeder." *See* Interview of James Stukes. *Id.* On April 1, 1998, the investigators conducted a further interview of Stukes which was embodied in a handwritten document entitled "Statement of James Stukes Regarding Events of March 27, 1998." *See* NYRA Hrg.Exh. 8 and last page of NYRA Hrg.Exh. 2. The statement was written by Wagering Board investigator Dominick Bolona and signed by Stukes after the statement had been read to him. NYRA Hrg. at 216–17.

Stukes later told the Stewards that he disagreed with part of the statement as written. NYRA Hrg. at 102. During his testimony at the NYRA hearing, Stukes denied knowing which horse he had held during the tubing. NYRA Hrg. at 615, 632. Although Stukes admitted to signing the April 1, 1998 statement, he claimed he had been pressured by the investigators and, since he was illiterate, he could not read the statement. *Id.* at 604–607, 610, 633. In a post-hearing submission based on evidence that she claims recently came to light, plaintiff's counsel points to notes of the Steward hearing involving Mitchell

Friedman in which Stukes refers to a tape recording made during one of his interviews which more accurately sets forth his statements. *See* Exh. B attached to affidavit dated July 6, 1998 of Karen Murphy. According to the notes, the stewards, after conferring with counsel, inexplicably declined to review the tape. *Id.*

The two NYRA panelists who testified at the preliminary injunction hearing [13] both agreed that one of the most significant pieces of evidence of Dr. Galvin's improper conduct was a tape recording of a conversation between Mitchell Friedman and Dr. Galvin. Tr. 168, 306. Friedman secretly tape-recorded the conversation in his effort to obtain evidence to show that he had nothing to do with the alleged improper medication of Hip Wolf. Tr. 353, 359. A copy of the transcript of the tape recording ("Tape Tr.") submitted by NYRA counsel at the administrative hearing over the objection of the plaintiff's counsel, NYRA Hrg. at 667–68, 732, is attached as Exhibit 2 to the Lieberman Aff.[14] At the court's direction, NYRA procured the attendance of Mitchell Friedman to authenticate the tape. Tr. at 51–54.

During the taped conversation, Friedman tried several times to get Dr. Galvin to agree to confess to "milkshaking" Hip Wolf. Although Dr. Galvin agreed to do what he could to show that Friedman knew nothing about what went on, Tape Tr. at 3–4, Dr. Galvin stated several times that he had not "milkshake" Hip Wolf. *Id.* at 12, 19. However, Dr. Galvin admitted that he may have done so a "long time ago," *id.* at 12, and that he did not "know what inspired him to do it" but that he "wanted to win the race" against "Love Medicine." *Id.* at 9.

### B. *Evidence of Prior Alleged Misconduct*

Besides claiming that Dr. Galvin improperly administered medication to "Hip Wolf" on March 27, 1998, NYRA counsel presented testimony and reports of past incidents involving Dr. Galvin which NYRA claimed evidenced improper veterinary practices. In the early 1990s, NYRA investigators had several encounters with Dr. Galvin which kindled their suspicions that Dr. Galvin engaged in prohibited activities, including "milkshaking" a horse and administration of a prohibited drug, as well as failure to follow proper procedures for security escorts. Tr. 51–53. These past incidents are recounted in the testimony of John Tierney, Director of Security for NYRA, NYRA Hrg. at 51–53, the TRPB Report by Peter Lang dated April 22, 1998 ("Lang Report") admitted as NYRA Hrg.Exh. 9, and an Inter–Office Memorandum dated September 27, 1994 from Vincent Ramirez of NYRA admitted as part of NYRA Hrg.Exh. 3.

The incidents included three instances in September, 1992, January, 1993 and October, 1993 where Dr. Galvin was found "under circumstances which indicated he was about to 'milkshake' the horse." In addition, both the Lang and NYRA Reports mention an incident where a horse treated by Dr. Galvin suddenly died without explanation, two instances where Dr. Galvin was cited for entering the receiving barn without proper security escort, one time where a horse tested positive for mepivicaine, and one time when Dr. Galvin was fined for practicing without a license or credentials. *Id.*

On September 22, 1994, NYRA commenced an investigation of Dr. Galvin for improperly medicating a horse after investigators found a puncture mark and blood

---

**13.** Plaintiff was not able to secure the attendance of the third panelist, Don Combs, for the preliminary injunction hearing.

**14.** Although both the tape and the transcript were the subject of considerable discussion at the NYRA hearing, it was not formally introduced as an exhibit and is not part of the administrative record filed by plaintiff. Plaintiff later submitted a list of minor corrections to the transcript, which I have accepted. *See* attachment to letter dated July 6, 1998 of Karen Murphy.

on a horse named "Mr. Baba" after Dr. Galvin had been seen exiting the barn where the horse was stalled. *Id.* Dr. Galvin denied improperly administering drugs and told investigators that test results taken from Mr. Baba were negative. NYRA did not take any action against Dr. Galvin as a result of the Mr. Baba incident. NYRA Hrg. at 815.

The Lang Report also mentions an incident in 1995 when NYRA investigators observed Dr. Galvin with a bucket containing a dose syringe, tubing and a milky substance in the stall of Overtake, a horse scheduled to run. Lang Report at 3. Plaintiff contended that Overtake had already been scratched from the races that day when he arrived to treat a colicky condition. NYRA Hrg. 826–27. This matter was resolved to plaintiff's satisfaction and no action was taken by NYRA following discussions between plaintiff's counsel and Chairman Noe. *Id.* at 824–26.

Other than fining Dr. Galvin once for lacking a license or credentials and once for failing to obtain an escort in the receiving barn, neither NYRA nor the Wagering Board have taken any prior disciplinary action against Dr. Galvin. NYRA Hrg. at 51.

Lang also set forth in his report his observations of improper treatment and possible violations occurring during his surveillance of Dr. Galvin. Lang observed five instances in which he felt Dr. Galvin had administered lasix late to horses scheduled to race and one instance when Dr. Galvin submitted a treatment slip with the time he administered lasix one-half hour before the listed time. *See* Lang Report at 4–5; NYRA Hrg. at 245–255. Lang also described two instances when he observed Dr. Galvin carrying a pail into a barn housing horses scheduled to race that day. Lang Report at 4, 5. Lang regarded use of a pail as suspicious behavior because it can be used to carry illegal tubing.[15] NYRA Hrg. at 289.

Plaintiff countered with testimony to dispel the notion that his practices were questionable. Veterinarians commonly use a bucket to carry implements around a barn. *Id.* at 515, 744. Although he had administered tens of thousands of lasix shots to horses scheduled to run, he had never been cited for a lasix overage.[16] *Id.* at 735; Tr. at 286. Dr. Galvin also explained that all veterinarians routinely violate the NYRA rule prohibiting the presence of equipment for tubing or injections in the stall of the horse scheduled to race within 24 hours, since lasix injections administered to horses scheduled to race are usually given in the stall in order to meet the 4 to 4 ½ window prescribed by Wagering Board regulations. NYRA Hrg. at 775–76.

Plaintiff also attempted to explain, to the extent he could recall, the circumstances of his recent conduct which Lang noted in his surveillance, as well as the prior conduct that NYRA investigators found to be questionable. *Id.* at 782–799, 801–824.

## C. *Conduct of the Hearing*

The NYRA hearing lasted approximately 25 hours. Tr. 191. NYRA counsel, as well as the chair of the hearing panel, frequently expressed aggravation at the pace of the hearing and delay. *See, e.g.,* NYRA Hrg. at 261–62, 419, 571, 590.

The panelists conferred following the close of testimony during each day of the hearing. Tr. 163–64, 312. The panelists then deliberated after the conclusion of the hearing and communicated their decision[17]

---

**15.** NYRA promulgated a rule on May 1, 1994 prohibiting any equipment used for injections or for stomach tubing from being taken into the stall occupied by a horse scheduled to race within 24 hours.

**16.** Steward Joyce testified that in 1997, the stewards found 63 instances of lasix overages, none of which involved Dr. Galvin. Tr. at 286.

**17.** Gabriel and Meyocks inexplicably gave conflicting testimony as to the day when the determination was made. Meyocks claimed that the panelists deliberated for an hour after

to NYRA counsel. *Id.* at 160–62; 322. NYRA counsel prepared a letter dated May 29, 1998 setting forth the panel's decision to deny Dr. Galvin credentials from June 8, 1998 through the end of the year. *Id.* at 160; *see* Tr.Exh. 6. The letter stated that the panel "has concluded that Dr. Galvin's conduct and presence at NYRA racetracks is detrimental to NYRA's business interests and the best interests of racing, generally." Tr.Exh. 6.

During the course of the hearing, the panelists attempted to avoid contact with NYRA counsel. Tr. at 155, 184, 226. However, Meyocks had discussions with NYRA legal counsel on a daily basis on other matters. *Id.* at 184. Meyocks also called Chairman Noe after each day of the hearing to give an update on what was happening at the hearing and to advise Noe of the panel's decision. Tr. 188–89, 190. Noe was also displeased with the delay, since the typical racetrack hearing before the stewards does not last more than three hours. Tr. 189.

By letter faxed on June 2, 1998, Ms. Murphy sought reconsideration of the May 29, 1998 decision. Tr.Exh. 7. Since the panel rendered its decision before preparation of the transcript of the final day of testimony, she charged that the panel did not give due deliberation to the evidence and sought time to make a post-hearing submission. She also challenged the sufficiency of the evidence to support the initial charge that Hip Wolf had been improperly medicated and complained that the determination failed to explain what Dr. Galvin did which was "detrimental to NYRA's business interests and the best interests of racing, generally." *Id.* Neither the hearing panel members nor any NYRA official responded to the letter. Meyocks felt there was no need to respond to the request for reconsideration. Tr. 185.

*Events after the NYRA Hearing*

After the decision, NYRA posted a sign in the security office before the gate en-

trance to the backstretch of the Belmont track stating that Dr. Galvin was not permitted to be at the racetrack and would be removed if found. The sign also indicated in capital letters that Dr. Galvin would be arrested if he entered a second time. Tr. at 35–36, 192. Suzann Bobley, an owner of race horses for 15 years, had never seen such a sign before and thought that Dr. Galvin had committed a crime. *Id.* at 37.

After plaintiff commenced this action, Dr. Neil Cleary, the Chief Examining Veterinarian for NYRA, visited the barns of James Bond and Howard Tesher, trainers who had previously employed plaintiff. Tr. 44 – 46. These trainers had submitted affidavits in support of Dr. Galvin's application for a temporary restraining order and alleged, *inter alia,* that plaintiff was providing critical care for certain sick horses. *Id.* at 43–44, 45, 50. Dr. Cleary claimed that he visited the trainers' barns because of concern over whether the horses named in the affidavits were receiving proper care. *Id.* at 43–44, 45, 50. However, I did not find this explanation persuasive, particularly given the timing of the conduct.

Dr. Cleary also contacted Dr. Selway and Dr. William Reed, veterinarians who had clinics near the Belmont racetrack, to see if three of the horses identified by Bond or Tesher in their affidavits had been treated at the clinics. *Id.* at 50–51. Dr. Reed, who had previously given Dr. Galvin permission to use the clinic, immediately withdrew his permission after Dr. Cleary's visit. *Id.* at 15–18. Although Dr. Reed denied feeling threatened, he stated that Dr. Cleary's "firm tone of voice" caused him to want to have the "situation to be clarified" before permitting Dr. Galvin back to his clinic. *Id.* at 16, 29. Dr. Reed said he did not want to do anything that NYRA did not want him to do, but claimed that after recently conferring with

the hearing on May 19, 1998, Tr. at 164–65, 200, while Gabriel testified that the decision

was made ten days later on May 29, 1998. Tr. at 322.

NYRA counsel, he would again permit Dr. Galvin back on the premises. *Id.* at 28, 31.

NYRA investigators apparently also visited the Saratoga farm of Mrs. Payson, which is located near the Aqueduct track, to ask about Dr. Galvin. Tr. 193. They also asked about the care of Jim Bond's horses at the Payson barn. *Id.* at 194.

Besides contacting Dr. Galvin's former clients and business associates, NYRA officials have also directed their attention to Dr. Galvin's attorney, Karen Murphy. On June 20, 1998, Chairman Noe told Dennis Brida, President of the New York Thoroughbred Association, a group that represents horsemen and trainers, that Noe would not meet to discuss a day care center if Ms. Murphy attended the meeting. *Id.* at 221–24, 447, 451–52. Ms. Murphy had represented the association for several years and most recently, in connection with that association's efforts to establish a day care center at NYRA tracks. However, she had just been fired a few days earlier. *Id.* at 446.

As Chairman Noe explained in response to questioning by Ms. Murphy:

I felt that after reviewing the panel and the steward's ruling and their investigation, I felt that it was basically my opinion, you are representing a veterinarian in a case such as we had, and he had been suspended and his credentials had been removed by NYRA, I just didn't feel that I wanted to continue on any discussion with you at this particular time [in Ms. Murphy's capacity as counsel].

*Id.* at 452. Meyocks also shared Chairman Noe's view that because of her representation of Dr. Galvin at the NYRA hearing, Ms. Murphy's participation was "not in the best interests of racing." *Id.* at 226, 228.

Dr. Galvin's veterinary practice virtually disappeared after June 8, 1998. Ninety-eight percent of his practice was conducted on NYRA tracks. *Id.* at 382. Before June 8, 1998, he had 50 clients and cared for approximately 50 horses a day. *Id.* at

377–78. Since the effective date of the ban, he has treated only a few horses at a clinic of Dr. William Reed and at the Payson farm. *Id.* at 379. His clients have left him for other veterinarians who are able to care for the horses at the tracks. *Id.* at 81, 381. Dr. Galvin has had difficulty finding other work at racetracks in other parts of the country. *Id.* at 386. If and when NYRA reinstates his credentials, Dr. Galvin will have considerable, if not insurmountable difficulties, in reestablishing his practice at NYRA racetracks, a problem compounded by the stigma that will attach to him because of the NYRA ban. *Id.* at 89.

Dr. Galvin is also unlikely to find other work as an equine veterinarian in New York, without a career change from the thoroughbred industry into another business such as standardbred or harness racing. However, opportunities in these areas are quite limited given the closed community and saturation of the market. *Id.* at 67–68.

Plaintiff has supported himself and his family primarily through collection of his outstanding accounts and his wife's income. *Id.* at 418.

### LEGAL STANDARDS AND CONCLUSIONS OF LAW

In order for a preliminary injunction to issue, plaintiff must demonstrate (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them fair ground for litigation, and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Waldman Publ. Corp. v. Landoll, Inc.,* 43 F.3d 775, 779 (2d Cir.1994), *citing Polymer Technology Corp. v. Mimran,* 37 F.3d 74, 77–78 (2d Cir.1994). Irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction." *Bell and Howell v. Masel Supply Co.,* 719 F.2d 42, 45 (2d Cir.1983). Where a plaintiff

establishes less than probable success on the merits, he must come forward with a greater showing of irreparable damage. *Triebwasser & Katz v. American Telephone & Telegraph Co.,* 535 F.2d 1356, 1359 (2d Cir.1976).

■ To establish irreparable harm, the moving party must demonstrate that the harm is imminent and the injury must be such that it cannot be fully remedied by monetary damages. *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir.1989). In other words, the harm must be either one not compensable in monetary terms or "one which cannot be reduced to monetary value with 'sufficient accuracy to make damages an adequate substitute' for injunctive relief." *Janmort Leasing, Inc. v. Econo–Car, Int.'l, Inc.,* 475 F.Supp. 1282, 1284 (E.D.N.Y.1979); *see also New York State Motor Truck Ass'n. Inc. v. New York,* 654 F.Supp. 1521, 1540 (S.D.N.Y.), *aff'd,* 833 F.2d 430 (2d Cir.1987) (business loss which cannot be calculated with a reasonable degree of certainty qualifies as "irreparable harm"); *Gibson v. U.S. Immigration and Naturalization Service,* 541 F.Supp. 131, 135 (S.D.N.Y.1982).

■ In the business context, irreparable harm may be established "where a party is threatened with the loss of a business." *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 37 (2d Cir.1995); *see also Petereit v. S.B. Thomas, Inc.,* 63 F.3d 1169, 1186 (2d Cir. 1995); *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.,* 588 F.2d 24, 28–29 (2d Cir.1978). As the Second Circuit recognized in *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir. 1970), a monetary award is inadequate to compensate for the termination of a business:

> But the right to continue a business in which William Semmes had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income from a damages award.

*See also Roso–Lino Beverage Distribs., Inc. v. Coca–Cola Bottling Co.,* 749 F.2d 124, 125–26 (2d Cir.1984) (per curiam) (irreparable harm from loss of "ongoing business representing many years of effort and the livelihood of its husband and wife owners") Likewise, a major disruption of a business can constitute irreparable injury since it can be as harmful as its termination. *Petereit,* 63 F.3d at 1185.

■ Plaintiff argues that he is irreparably harmed by virtue of the fact that he has been deprived of his constitutional rights. However, the cases cited by plaintiff[18] and other cases in which courts have found allegations of a constitutional deprivation sufficient to prove irreparable harm have ordinarily involved infringements of First Amendment rights, such as free speech and association, or other fundamental rights. *Marano v. New York City Transit Authority,* Dkt. No. CV 92–5158, 1993 WL 17434 at *3 (E.D.N.Y. January 19, 1993). These rights are viewed to be "of such qualitative importance as to be irremediable by any subsequent relief." *Id.* quoting *Public Service Co. of New Hampshire v. Town of West Newbury,* 835 F.2d 380, 382 (1st Cir.1987). On the other hand, violation of due process rights, without more, is insufficient to establish irreparable harm. *Id.,* citing *Public Service,* 835 F.2d at 382 and *Church of Scientology of California v. Untied States,* 920 F.2d 1481,

---

**18.** As plaintiff concedes in his supplemental submission on irreparable harm, the courts applying a presumption of irreparable harm where there is a constitutional violation have addressed only First Amendment violations, Eighth Amendment violations affecting a prisoner's health, safety and conditions of confinement and violations of the Equal Protection Clause. *See* letter dated June 11, 1998 of Kim Bonstrom. Although plaintiff asserts an Equal Protection Claim, he did not press this claim at the preliminary injunction hearing. Nor is it likely that he could establish such a claim since he has not alleged discriminatory treatment on the basis of any protected classification.

1488 (9th Cir.1990), *cert. denied,* 500 U.S. 952, 111 S.Ct. 2258, 114 L.Ed.2d 711 (1991); *see also Barrett v. Harwood,* 967 F.Supp., 744, 747 (N.D.N.Y.1997).

However, plaintiff has nonetheless demonstrated that he will be, if he has not already been, irreparably harmed by the ban from NYRA premises. As plaintiff stated, his veterinary practice revolves around thoroughbred race horses and has almost exclusively been carried out at NYRA premises. Both his testimony and that of Dr. Belden convincingly establish that NYRA's ban has effectively destroyed the veterinary practice that plaintiff has developed in the past ten years. After the ban went into effect, plaintiff quickly lost all of his clients with thoroughbred races horses stabled at NYRA. There is little likelihood that plaintiff will be able to re-build his practice in the near future once, and if, his NYRA credentials are reinstated. Tr. at 64.

Dr. Belden, who is also an equine veterinarian, testified about his experience when he interrupted his private practice to become Chief Veterinarian of NYRA for eight months. Tr. at 59. Although he had expected most of his clients to stay with his former partner who continued their joint practice without him, that did not happen. After Dr. Belden returned to the practice, he found that not only did his clients switch to new veterinarians, most did not switch back to him. *Id.* at 59–61. The lack of client loyalty would pose even greater problems for plaintiff, who would be returning to practice with the stigma of having been banned by NYRA, rather than from a position of prestige, as in Dr. Belden's case. *Id.* at 89. While defendants may be correct that there are other areas of equine work in which plaintiff could engage, there is little evidence to suggest that any of these areas of practice are readily penetrable by an outsider such as Dr. Galvin. *Id.* at 67. In any event, the crucial fact that defendants do not dispute is that Dr. Galvin has no realistic possibili-ty of rebuilding his practice at NYRA tracks in the foreseeable future.

Defendants also argue that plaintiff's showing of financial distress or injury to reputation is not sufficient to establish ir-reparable harm, relying on *Sampson v. Murray,* 415 U.S. 61, 91–92, 94 S.Ct. 937, 953–54, 39 L.Ed.2d 166 (1974) and its progeny. In *Sampson,* the Supreme Court held a plaintiff claiming injuries resulting from the loss of employment, including loss of income, damage to repu-tation and difficulties in finding new em-ployment, cannot establish irreparable harm absent a showing of "extraordinary circumstances." *Id.* However, this strict standard applies to cases involving loss of government employment. *American Postal Workers Union v. United States Postal Service,* 766 F.2d 715, 721 (2d Cir. 1985), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1262, 89 L.Ed.2d 572 (1986). This distinction is critical since a plaintiff sub-ject to adverse action in employment with the government has the ability to recover both lost income and reinstate-ment should he prevail. In contrast, a monetary award will not necessarily en-able Dr. Galvin to regain his clients and reestablish his practice at NYRA tracks, the profession he has been developing for the past ten years.

Thus, I find that plaintiff has shown that he will be irreparably harmed.

### A. *Likelihood of Success*

 In addition to irreparable harm, plaintiff must also demonstrate likelihood of success on the merits or sufficiently serious questions going to the merits and a tipping of the equities. Defendants argue that the "likelihood of success" standard must be applied since this case involves governmental action taken in the public interest. *See, e.g., Plaza Health Lab., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989); *Medical Soc'y of the State of New York v. Toia,* 560 F.2d 535 (2d Cir.1977). Howev-er, this stricter standard is not automati-cally triggered simply because a movant

seeks to enjoin governmental action. *Carey v. Klutznick,* 637 F.2d 834, 839 (2d Cir.1980); *Hudson River Sloop Clearwater, Inc. v. Department of the Navy,* 836 F.2d 760, 763 (2d Cir.1988) (per curiam); *Patchogue Nursing Center v. Bowen,* 797 F.2d 1137, 1141–42 (2d Cir.1986), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 828 (1987). The stricter standard is not appropriate except when a governmental defendant is taking action in the public interest clearly authorized by a specific statute or regulatory framework. *Haitian Centers Council, Inc. v. McNary,* 969 F.2d 1326, 1338–39 (2d Cir.1992), *vacated as moot,* 509 U.S. 918, 113 S.Ct. 3028, 125 L.Ed.2d 716 (1993). In any event, I find that plaintiff has more than adequately demonstrated a likelihood of success on the merits.

■■■■■ In order to assert a claim for violation of due process rights under Section 1983,[19] a plaintiff must first establish that he had a liberty or property interest protectible under federal law. *See White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1061–62 (2d Cir.), *cert. denied,* 510 U.S. 865, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993). Constitutionally protected property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). These entitlements may arise from the existence of objective standards of eligibility for licenses affecting entry in a profession or other revenue generating activity. *Bell v. Burson,* 402 U.S. 535, 542, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Willner v. Committee on Character and Fitness,* 373 U.S. 96, 102, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963); *Goldsmith v.*

*United States Bd. of Tax Appeals,* 270 U.S. 117, 123, 46 S.Ct. 215, 70 L.Ed. 494 (1926).

Plaintiff clearly has a property interest in his license and NYRA credentials. Under New York law, licensees cannot have their licenses suspended by racing officials without a hearing and therefore have a legitimate expectation of continued enjoyment of their licenses absent a finding of culpable conduct. *Barry v. Barchi,* 443 U.S. 55, 65, n. 11, 99 S.Ct. 2642, 2649 n. 11 (1979). Given NYRA's "virtual monopoly power over thoroughbred racing in the State of New York," its decision to exclude a licensee from its tracks "is tantamount to barring [the licensees] from the only places in the State where he may ply his trade ..." *Jacobson v. New York Racing Ass'n, Inc.,* 33 N.Y.2d 144, 149–50, 350 N.Y.S.2d 639, 642, 305 N.E.2d 765 (1973). NYRA thus cannot suspend credentials without affording due process. *Id.* Since NYRA rarely convenes a panel to take action against a credential holder and, in fact, provided plaintiff with a pre-suspension hearing, there is no serious issue that plaintiff was entitled to some sort of due process from NYRA.

■■■■■ The main question is whether plaintiff was accorded sufficient procedural protections. Procedural due process requires notice and a meaningful opportunity to be heard prior to the deprivation of a protected interest. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493 (1982). The determination of what process is due must be based on federal law. *Kelly Kare, Ltd. v. O'Rourke,* 930 F.2d 170, 175 (2d Cir.), *cert. denied,* 502 U.S. 907, 112 S.Ct. 300, 116 L.Ed.2d 244 (1991) (citing *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 538–41, 105 S.Ct. 1487, 1493 (1982)). Since due process is a flexible concept dependent on the specific circum-

---

19. Defendants have, for purposes of the preliminary injunction hearing, elected not to challenge plaintiff's contention that defendants were acting "under color of state law" within the meaning of Section 1983. *See* Preliminary Memorandum of Law of defendants in opposition to plaintiff's motion at 14.

stances, the determination of what process is due involves a balancing of three factors:

> First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

Applying the three factors outlined in *Mathews,* Dr. Galvin's interests in being able to make a full presentation of his defense clearly outweighed NYRA's interest in speedy resolution of the matter. Deprivation of his NYRA credentials essentially meant a loss of his livelihood for Dr. Galvin. Balanced against plaintiff's hardships, NYRA's generalized interest in protecting the integrity of racing in New York does not justify the haste in holding a hearing, particularly since NYRA chose to wait more than a month after the Hip Wolf incident on March 27, 1998 before convening a panel. In other words, when barring a person "from privileges in an association which monopolizes the enterprise to which persons devote their careers even greater care must be taken to safeguard the rights of the individual." *Lindemann v. American Horse Shows Assoc.,* 164 Misc.2d 937, 947, 624 N.Y.S.2d 723, 729 (N.Y.Co.1994) (quoting *Barry,* 443 U.S. at 66, 99 S.Ct. at 2650 that since "... the consequences to a trainer of even a temporary suspension can be severe ...., the opportunity to be heard must be 'at a meaningful time and in a meaningful manner.' *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1192, 14 L.Ed.2d 62 (1965).")

Three days' notice ordinarily is not sufficient time to prepare for most hearings and was woefully inadequate in this case, where the charges involve serious violations of racing rules and regulations. *See Harding v. U.S. Figure Skating Assoc.,* 851 F.Supp. 1476, 1479 (D.Ore.1994) (injunctive relief was warranted against figure skating association's disciplinary hearing that was set for 3 days after skater's reply to complex charges and probable defenses). Although a deficiency in notice may not in itself warrant preliminary injunctive relief where plaintiff received an adequate opportunity to be heard, *Plaza Health,* 878 F.2d at 581, the ten-day period between the start and conclusion of the hearing hardly afforded plaintiff such an opportunity. The panel even denied plaintiff the opportunity to submit post-hearing papers. In this case, as in *Lindemann* and *Harding,* NYRA chose to subordinate fairness "to the perceived need for speed." *Lindemann,* 164 Misc.2d at 951, 624 N.Y.S.2d at 731. The lack of time clearly impacted the ability of plaintiff to arrange for witnesses, prepare for examination and to make legal arguments.

NYRA compounded the procedural deprivation by refusing to provide plaintiff with copies of relevant investigative documents until after the hearing began and by refusing to particularize what "veterinary activities" were under investigation. *See Gleason v. Chain Service Restaurant,* 422 F.2d 342, 343 (2d Cir.1970) (charges which only generally refer to years in question and fail to provide dates and other specific identifying information about the persons involved found too vague to satisfy due process). As the court in *Gleason* pointed out:

> One cannot assume an accused is guilty, with knowledge of his own dereliction. Although the framer of these charges may well have had specific incidents in mind, as written they did not give [plaintiff] the information needed to conduct a meaningful investigation and prepare a defense.

*Id.*

▮▮ The lack of specificity of charges significantly hindered plaintiff's efforts to

defend himself since most of the questionable conduct raised in the reports introduced by NYRA concerned events from several years before. Defendants' excuse that the panel was still investigating the charges against Dr. Galvin does not justify the lack of particularization, since the evidence ultimately presented by NYRA was contained in the Lang report and a 1994 NYRA investigative report, documents which NYRA had reviewed before the hearing commenced. Plaintiff's counsel not only was also prevented from questioning NYRA's witnesses, but had little basis for challenging these events without more specific information or any underlying notes.

More troubling than the lack of notice was the conduct of the hearing itself. Due process requires that a hearing be conducted before a fair and impartial impartial decision maker. *McCann v. Coughlin,* 698 F.2d 112, 122 (2d Cir.1983); *Woodland Nursing Home Corporation v. Weinberger,* 411 F.Supp. 501, 504 (S.D.N.Y. 1976), citing *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). While NYRA may appoint its own employees to sit on the panel, *Hortonville Joint School District No. 1 v. Hortonville Education Association,* 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976), NYRA may not appoint a decision maker who had previously "participated in making the determination under review." *Goldberg,* 397 U.S. at 271, 90 S.Ct. at 1022.

Serious questions arise from the participation of Terrence Meyocks as chair of the panel. Notwithstanding his claims of impartiality, Meyocks's position and prior involvement made it difficult, if not impossible, for him to be objective. As president of NYRA, he had been aware of the ongoing investigation against Dr. Galvin and had discussions with Chairman Noe which ultimately led to the appointment of the panel. Tr. at 153. He reported to Chairman Noe after every day of testimony and immediately after the panel made its decision. He also had daily contact with the NYRA attorneys presenting NYRA's case. In addition, Meyocks had close contact NYRA counsel who presented NYRA's case. NYRA counsel had a critical role in determining the procedures to be followed, including responding to plaintiff's request for an adjournment, without consulting the panelists.

Meyock's bias was apparent when the panel ruled on the objection by NYRA counsel to the scope of cross-examination of Peter Lang by plaintiff's counsel. Meyocks limited cross examination of the incidents listed in Lang's report to the instances of questionable conduct which Lang personally observed. NYRA Hrg. at 571–77. In so ruling, he thereby deprived plaintiff the opportunity to rebut the other evidence in the reports. As the reports made clear, several of the instances of questionable conduct consisted of vague observations which had not given rise to a formal investigation or other action by NYRA. For example, the Lang report referred to observations made in September, 1992 and January 24, 1993 by a NYRA investigator that Dr. Galvin had "possession of milkshaking" equipment or implements. Lang Report at 2–3.

Moreover, it is doubtful whether any presentation by plaintiff would have affected the panel's decision. Meyocks stated, when he limited plaintiff's right to cross-examine Lang, that "[m]any of these incidents were from the NYRA investigations, so we will accept it for our decision making." *Id.* at 577. Such blind acceptance is not a proper approach for a fact finder who is supposed to be neutral.

Meyock's testimony at the hearing does little to bolster confidence in his impartiality. I did not find his testimony credible that the panel started with a clean slate and had not charged Dr. Galvin with any wrongdoing. Tr. at 143. On the contrary, I conclude that the panel was convened precisely because NYRA had already decided to take action against Dr. Galvin. NYRA had begun an investigation of Dr. Galvin in 1997 and had sought the assis-

tance of the TRPB when NYRA's own investigators were unsuccessful in their efforts. Not content with waiting for the slow disposition of Dr. Galvin's appeal from the Stewards' decision to the Wagering Board, NYRA, with Meyock's input, then sought to exercise its jurisdiction over the matter.

NYRA's attitude toward Dr. Galvin is further evidenced by the disturbing conduct of its officials after the panel made its decision to ban him, an effort which effectively extended the reach of the ban to prevent Dr. Galvin from practicing veterinary medicine off NYRA grounds. As Chairman Noe candidly admitted:

> I have to say very openly that if someone I felt did something detrimental to this industry, then I would proceed to try to see to it that he does not work on a racetrack or is not employed in any capacity or licensed in any capacity.

Tr. at 479–80. I find that Dr. Cleary did not, as he claimed, have any real concern over the condition of the horses in the stables he visited. Rather, his visits were part of NYRA's effort to undermine efforts by Dr. Galvin to continue treating thoroughbred race horses. The efforts clearly achieved the intended result in the case of Dr. Reed, who refused to deal with Dr. Galvin immediately after Dr. Cleary's visit. Even a witness such as Dr. Belden, whose business was not dependent on work at NYRA, expressed concern over possible adverse reaction by NYRA to his appearance. Tr. at 72–72, 77. However incorrect Dr. Belden's perception may have been, it is clear that in the small world of the thoroughbred racing, Tr. at 437, even seemingly innocuous actions taken by racing officials, who are vested with considerable authority, can have a profound effect on those whose livelihoods depend on the discretion of these officials.

Even more egregious was the fact that NYRA sought also to punish Dr. Galvin's attorney, Ms. Murphy. NYRA not only openly condemned her as not being "in the best interests of racing," it attempted to exclude her from representation of other clients working with NYRA. What is particularly difficult to understand is the apparent belief of both Chairman Noe and Meyocks that NYRA was justified in refusing to deal with Ms. Murphy, simply because she represented Dr. Galvin and did so in a vigorous manner beyond the usual practice. While such conduct does not give rise to an actionable claim by Dr. Galvin, it reflects an impermissible attitude which infected the NYRA hearing and resulted in a proceeding that was not fair and an outcome that was not reliable. *See Mathews*, 424 U.S. at 343, 96 S.Ct. at 907.

However, I note that an impartial hearing panel utilizing fair procedures could very well make the same findings and reach the same conclusion as the previous NYRA panel. But, given the conflicting evidence about the Hip Wolf incident and the murky evidence about Dr. Galvin's other actions, the result could conceivably be very different. Thus I find the NYRA hearing panel's findings, to the extent there were any, cannot be excused as harmless error.

The trial court finding in *Lindemann*, is clearly applicable here:

> Given the declared objectives of the Association, its predominant concern for its self-image, and its desire to keep the suspensions in force, the question is whether the Hearing Committee had any desire to afford to plaintiffs a real hearing, or whether the hearing was regarded as an annoying hurdle to overcome before reaching a foregone conclusion.

164 Misc.2d at 950, 624 N.Y.S.2d at 731. Under such circumstances, plaintiff clearly has established a likelihood of success on his procedural due process claim. The defendants, in their preoccupation with reaching a result they felt was right, lost sight of the fact that if the integrity of racing is to have any meaning, the process through which decisions are reached must both appear to be and, in fact, be fair.

Finally, I note that notwithstanding the devastating effect that the NYRA

ban already has had on Dr. Galvin's practice, injunctive relief is still warranted to prevent the complete destruction of his business. The interruption of a few months thus far is significantly shorter than the eight-month hiatus experienced by Dr. Belden. Since Dr. Galvin would have to apply to NYRA for credentials again after the ban expires in January, 1999, the effective length of the ban could even be longer without court action. By being able to enter NYRA tracks again, Dr. Galvin would also have the opportunity to attempt to restore his reputation and re-establish business contacts necessary for a successful practice.

In light of the foregoing, I do not reach the issue whether plaintiff has established any of his other claims.[20]

## CONCLUSION

For the foregoing reasons, I respectfully recommend that plaintiff's motion for a preliminary injunction be granted and that the defendants be enjoined from implementing their decision of May 29, 1998 to suspend Dr. Galvin's credentials.

The parties have been notified that this Report and Recommendation will be mailed by Federal Express on this date, if not picked up by messenger. Any objections must be filed with the Clerk of the Court, with a copy to the undersigned, by August 31, 1998. Failure to file objections within the specified time waives the right to appeal the district court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b).

**SO ORDERED.**

August 14, 1998.

---

**20.** Plaintiff also has argued that the evidence establishes likelihood of success on the substantive due process claim. As the Supreme Court has observed: "As a general matter, the Court has always been reluctant to expend the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open ended." *Collins v. Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992). The court has ordinarily limited the protections of substantive due process "to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver,* 510 U.S. 266, 272, 114 S.Ct. 807, 812, 127 L.Ed.2d 114 (1994).